UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



--------------------------------------------X
                            :

CHARLES M. KAVANAGH,         :

      PLAINTIFF,          :

      -v-              :

JOSEPH ZWILLING, JOHN WOODS,  :
ARCHDIOCESE OF NEW YORK,    :
and CATHOLIC NEW YORK,      :

        DEFENDANT .       :

--------------------------------------------X

12- CV

ECF CASE

**COMPLAINT AND
DEMAND FOR JURY TRIAL**

## PARTIES

        NOW COMES the Plaintiff, Charles M. Kavanagh, by and through his attorneys and in support of his complaint states as follows:

        1.     Plaintiff, Charles M. Kavanagh was a priest in New York, and is now a resident of the City of Lake Worth, County of Palm Beach, State of Florida.

        2.     That Defendant Archdiocese of New York resides in the City of New York, State of New York and is the publisher of Defendant Catholic New York and is the employer of co-defendants Joseph Zwilling, Director of Communication and John Woods, Editor in Chief.

        3.     That Defendant Joseph Zwilling is the Director of Communications for the Archdiocese of New York; and, Defendant John Woods is the Editor in Chief of Catholic New York and both are employed by the Archdiocese of New York and work in the City of New York, County of New York, State of New York.

4.      That Defendant Catholic New York is a publication/newspaper owned and controlled by the Archdiocese of New York, doing business in the City of New York, County of New York and State of New York.

5.      That Defendants Archdiocese of New York, and its Defendant employees, Zwilling and Woods, issued a libelous press release on May 1, 2012, and Defendant Catholic New York published this libelous press release on May 3, 2012

6.      The alleged libelous press release stated:

**STATEMENT OF JOSEPH ZWILLING: UPDATE ON CHARLES KAVANAGH**

Joseph Zwilling, Director of Communications for the Archdiocese of New York, released the following statement on May 1, 2012, concerning Charles Kavanagh.

"It has come to the attention of the Archdiocese that the victim in the Charles Kavanagh case has changed one of his claims, specifically concerning an overnight trip to Washington, D.C. during the victim's senior year in high school.

It should be noted that Mr. Kavanagh was found guilty by a church court of multiple counts of sexual abuse of a minor, and that this particular trip was not the basis for the court's decision.  Changing this one fact will not have any bearing on the court's ruling, or on its penalty that Mr. Kavanagh be removed from the priesthood and returned to the lay state.

We have shared this statement with the victim in this case, who has agreed to its release, as well as with Mr. Kavanagh's attorneys." **(See Exhibit 1, Press Release)**

Defendant Catholic New York published this statement in its newspaper

on May 3, 2012. **(See Exhibit 2)**

**JURISDICTION**

7.      That damages exceed $75,000.00 and subject matter jurisdiction is vested in this Court based on diversity 28 USC 1332.

8.      That pursuant to 28 USC 1391 venue is proper in the United States District Court Southern District of New York since a substantial part of the events giving rise to the claims occurred in the City of New York and all of the Defendants reside in the Southern District of New York.

## FACTUAL ALLEGATIONS

9.      In May 2002, Daniel Donohue contacted Edward Cardinal Egan of the Archdiocese of New York and complained that he had been sexually abused by Msgr. Charles Kavanagh more than 20 years earlier when he was a minor student at Cathedral Preparatory Seminary.  Specifically Donohue alleged two (2) incidents of alleged sexual abuse and he specifically denied that there were any other incidents or that there had ever been any sexual contact between he and Plaintiff Kavanagh at any time.

10.     Specifically, Donohue alleged that on one occasion the Plaintiff had "jumped on him and rubbed his face on Donohue."  The second alleged incident according to Donohue occurred when he claimed the Plaintiff took him to a Right to Life march in Washington, D.C. when he was a senior in high school and got into bed with him while the Plaintiff was wearing only his underwear.  Donohue claimed that the Plaintiff rubbed up against him during this alleged incident. Donohue repudiated this allegation in Federal Court on April 26, 2012.

11.     On May 24, 2002, Edward Egan ordered the Plaintiff to leave his home at St. Raymond's Church and informed him that he was prohibited from acting as a priest because of an allegation that Plaintiff had an "improper relationship" with a minor which allegedly occurred more that 20 years earlier.  Plaintiff was told that the Archdiocese had informed the media of the

Plaintiff's suspension. This was the first and only time, before or since, that the Archdiocese of New York has ever made a public announcement about an accusation against a priest.

12.     Within a short time of the public announcement of Plaintiff's suspension, hordes of media converged on St. Raymond's Church looking for the Plaintiff. Multiple television stations, both local and national, broadcast the Plaintiff's picture and the archdiocese's announcement that the Plaintiff was removed because of an allegation of an "improper relationship" with an unidentified minor. The Archdiocese refused to report that the Plaintiff denied the charges.

13.     Plaintiff had, in fact, vehemently denied that he had ever sexually abused Mr. Donohue or anyone else.

14.     Between May 25, 2002 and December 2010, there were multiple stories printed in the press each repeating the defamatory, false charges of Mr. Donohue.

15.     Despite widespread publicity about the sexual abuse crisis in the church across America, and the allegations against the Plaintiff specifically, not one other person/alleged victim ever came forward and claimed to have been abused by the Plaintiff. Donohue was the sole accuser.

16.     In August, 2003, based solely on the false claims by Donohue, Cardinal Edward Egan told the Plaintiff he was recommending that the Plaintiff be permanently removed from ministry because of an "improper relationship which had sexual overtones." He instructed Plaintiff to voluntarily sign papers removing him from the priesthood. The Plaintiff forcefully refused and he told Edward Egan that he would fight any attempt to dismiss him. In response, Egan threatened him saying, "There will be a lot of publicity."

17.     Between August 2003 and December 2005, the Archdiocese deliberately misinformed Plaintiff about the status of his case denying that it had been sent to Rome.  The Plaintiff contacted Rome himself and discovered the Archdiocese had surreptitiously sent the case and requested that the Plaintiff be laicized.

18.     During this time period, the Plaintiff took and passed two (2) lie detector tests but the Archdiocese refused to consider this evidence of the Plaintiff's innocence.  No criminal charges were filed after extensive investigations by public authorities.

19.     Despite Donohue's claim that the alleged incident in a hotel room occurred when the Plaintiff took "a group of boys to the Right to Life March in Washington D.C. when they were in high school" a faculty member from Cathedral Prep confirmed that no students from the high school ever went to the Right to Life March in Washington, D.C. while they were minors in high school but the Archdiocese also refused to consider this evidence..

20.     On November 8, 2005, in an attempt to prejudice the Congregation of the Doctrine of the Faith which was handling the case against the Plaintiff, Edward Egan wrote a letter to Cardinal William Levada, the head of the Congregation, claiming that the Plaintiff was "abusing" him i.e. Cardinal Egan.  Egan forwarded the letter to Pope Benedict. **(See Exhibit 3, letter from Edward Egan)**

21.     In January 2006, the Congregation of the Doctrine of the Faith in Rome denied Cardinal Egan's request to laicize (remove from the priesthood) the Plaintiff and instead ordered that a "secret" canonical trial be held in Erie, PA.  When Edward Egan called the Plaintiff into his office to inform him of the decision from Rome, he refused to speak directly to the Plaintiff and would not shake hands with the Plaintiff's canonical advisor, a priest the Cardinal had known for more than 40 years.

22.     In November, 2006 the secret canonical trial was scheduled.  Prior to the canonical trial a "libellus" (akin to an indictment) was issued.  In the "libellus" the Archdiocese of New York included a complaint from another former student who had written an anonymous letter claiming the Plaintiff had "turned his life upside down."  The Archdiocese had tracked this anonymous letter writer down and the Plaintiff discovered that he was a former student who the Plaintiff had expelled from Cathedral Prep because he molested another student.  When this person was readmitted to Cathedral College 2 years later, he molested the same student again and the Plaintiff was again instrumental in having him removed from the seminary.  In the ensuing years this same person was expelled from several more seminaries.

23.     Despite being informed of these facts suggesting the malice this complainant had against the Plaintiff, the Archdiocese included a complaint from this person that the Plaintiff had "urinated in the bathroom with the door open" and "spoken to him about masturbation."  Plaintiff's canonical counsel objected to inclusion of this complaint but her objection was rejected.

24.     In November, 2006 the secret church trial began. There were three priests who were "judges" on this "secret court."  Neither the Plaintiff nor his counsel was permitted to review any evidence submitted before trial.  The Plaintiff was not allowed to be present during any testimony and Plaintiff's counsel was not permitted to ask any questions.  The chief judge took testimony from several witnesses, including the anonymous letter writer who had molested another student, in secret without even informing Plaintiff's canonical counsel.  A court reporter recorded the testimony.  All witnesses were asked to take a vow of secrecy and were informed that if this vow was broken they could be excommunicated.  Daniel Donohue and his sister, Patricia Donohue White refused to make a vow of secrecy.

6

25.    At the trial Daniel Donohue did take an oath to tell the truth.  Under oath, Donohue testified again that the Plaintiff took him to the Right to Life March in Washington, D.C. when he was a senior in high school at Cathedral Prep.  He testified that the Plaintiff also took two other young men on the trip. **(See Exhibit 4, Testimony of Daniel Donohue)**

26.    Multiple former students, including the two Mr. Donohue had testified accompanied him and Plaintiff to Washington, D.C., testified that they had not attended the Washington D.C. March and no students from the Prep ever attended that Right to Life March. Former faculty testified also that no students were permitted to attend the March during their senior year.

27.    A former classmate of Mr. Donohue's from Cathedral College, Louis D'Amico, testified that during their second year in college, by which time all the men were adults, the Plaintiff did accompany him and Donohue to that year's Right to Life March.  Unfortunately for Mr. Donohue, Mr. D'Amico testified that Donohue stayed in a room with him and the Plaintiff stayed in a room by himself and never came into their room.

28.    Not one witness confirmed Donohue's allegations, and all res gestae witnesses specifically denied them.  All of Donohue's former friends testified that Donohue had a complete change in attitude and personality when he began an intimate, romantic relationship with a woman he met during his second year in college.

29.    Despite all of the testimony which confirmed that Donohue was lying, the "secret court" issued its findings on November 12, 2008.  In its opinion, the court rejected the claim of the anonymous letter writer, but based solely on Donohue's accusation, it found the Plaintiff guilty of "one count" of sexual abuse of a minor: "handholding in the lap" which allegedly occurred during prayer.  The secret court concluded that this was a "delict" (sin) against the sixth

commandment because of its proximity to the genital area which is an indecent part of the body" and thus, constituted sexual abuse of a minor as described by the church. In support of its conclusion the court cited to Donohue's testimony at pp 118-119 even though in a review of Donohue's testimony was that they held hands during prayer with their hands either "on his side or my side," not in Mr. Donohue's lap. The secret court did not find the Plaintiff guilty of any other "counts" or "delicts." **(See Exhibit 4)**

30.     In addition, despite the uncontroverted testimony regarding the alleged trip to Washington while Donohue was a minor in his senior year of high school, the "secret court" found to a moral certainty that the trip as described by Donohue did occur. The court found Donohue to be completely credible.   Plaintiff appealed the decision.

31.     In July, August and December 2010, Donohue repeated his claims of sexual abuse on the alleged trip to Washington when Donohue was a minor and a high school student. These charges were then published in the Journal News and the New York Post.

32.     In December, 2010, the Appeals Court of the Church affirmed the secret canonical court's decision and the Plaintiff was removed from the priesthood for the crime of "handholding in the lap."   Plaintiff lost his pension, his medical coverage, his housing and all benefits. One month later, the chief judge of the secret trial was made a bishop.

33.     On March 26, 2011, Plaintiff filed a defamation lawsuit against the accuser, Daniel Donohue, asserting that his claim about the trip to Washington was a lie. In response to the complaint, Donohue asserted that he now had a "recollection" that the alleged trip may not have happened in high school when he was a minor but rather it occurred during his first year in college. During the course of discovery Plaintiff provided affidavits from eight witnesses affirming the trip as described by Donohue never occurred either in high school or during his

first year of college.  At deposition, Defendant testified he had no witnesses who could confirm the truth of his statement.

34.     On April 26, 2012, at a mediation requested by Donohue in the presence of U.S. District Court Judge Michael Hogan of Oregon, Donohue admitted he had not told the truth and signed a statement attesting to this. **(See Exhibit 5)**

35.     On April 29, 2012, Plaintiff's counsel sent a private letter to Timothy Cardinal Dolan informing him that the Plaintiff's accuser had admitted he lied and offered the Archdiocese a chance to be the first to announce this significant retraction by the sole accuser. **(See Exhibit 6)**

36.     In response to Plaintiff's letter, Joseph Zwilling, on behalf of the Archdiocese of New York, issued the previously cited press release (see paragraph 6 above) in which it stated that it had learned that the Plaintiff's accuser had "changed one of his claims."  The press release continued, "It should be noted that Mr. Kavanagh was found guilty by a church court of multiple counts of sexual abuse of a minor…."  Catholic New York published this statement in full on May 3, 2012 and distributed it to thousands of homes in the Archdiocese of New York. **(See Exhibit 1 Press Release and Exhibit 2 Story)**

37.     That Defendant Zwilling implied in his statement of May 1, 2012 that multiple people had accused the Plaintiff of sexual abuse of a minor, other than the complaint of Daniel Donohue, discussed below, when in fact, no complaints of sexual abuse have ever been alleged against Plaintiff by any other person.  Furthermore, Defendants Zwilling, Woods and the Archdiocese of New York knew that this sole accuser, Daniel Donohue had always specifically denied that the Plaintiff had ever kissed him, touched his genitals or made any sexual contact whatsoever.

38.     When the Defendants issued this libelous press release and published this statement in Catholic New York, the Defendants knew the statement was false and deliberately misleading.  They knew their press release implied that there were multiple accusers and also implied that a court which adhered to principles of American justice had fully examined evidence and had determined that the Plaintiff was found guilty of multiple crimes of sexual abuse of a minor, as defined by the criminal code and as understood to be crimes in general society.  They intended this implication.   Defendant deliberately used the words "multiple counts" which are identical to the words used by criminal prosecutors, in order to convey this false and defamatory implication to the reader.  **(See Exhibit 7, Affidavit)**

39.     The Defendants deliberately withheld the information from their release that the accuser had not just "changed" his story but in fact had admitted he lied.  They deliberately withheld the information that it was a "secret court" that judged Plaintiff and that the Plaintiff had never been allowed to confront witnesses and his attorney had never been permitted to question witnesses.  **(See Exhibit 7)**

40.     The Defendants' statement deliberately implied that there were multiple accusers when they knew Donohue was the only accuser and they deliberately withheld the information that the "crime" the Plaintiff was found guilty of was "handholding in the lap during prayer," something no reasonable person would consider "sexual abuse of a minor."

## COUNT I – DEFAMATION PER SE

41.     Plaintiff reasserts and realleges each of the preceding paragraphs as if recited verbatim herein.

42.     As set forth previously, Defendants with malice, published statements to the New York media and to the Catholics in New York about Plaintiff which were false and defamatory per se.  These statements were widely distributed in the print media as well as on the internet. These statements stated that the Plaintiff, a holy and celibate priest had actually been convicted of "multiple counts" of a loathsome crime of moral turpitude, namely of sexual abuse of a minor. In fact, when the Defendants published these statements, they knew that Plaintiff had only been convicted by a secret church court of a single "count" of what the church determined was sexual abuse and that crime was "handholding in the lap."

43.     As a direct and proximate result of Defendants' publication of the false and defamatory per se statement the Plaintiff was grievously and irreparably harmed and his reputation was severely damaged, especially at a time when the Defendants were among the first to know that Donohue had recanted his claim of sexual abuse during his fictitious trip to the Washington D.C.'s Right to Life March during Donohue's senior year of High School.


## COUNT I I – DEFAMATION PER SE BY IMPLICATION

44.     Plaintiff reasserts and realleges each of the preceding paragraphs as if recited verbatim herein.

45.     As set forth previously on May 1, 2012, Defendants, with malice, published statements [press release] to the New York media and, on May 3, 2012, to the Catholics in New York about Plaintiff which were false and defamatory per se by implication.  These statements were widely distributed in the print media as well as on the internet.  These statements suggested and implied that the Plaintiff, a holy and celibate priest had actually been convicted, in a court

which adhered to American principles of justice, of "multiple counts" of a loathsome crime of moral turpitude, namely of sexual abuse of a minor.

46.    Defendants knew this statement was false and misleading and they made it intending for it to be widely published in New York and it was so published.  Defendant deliberately used the words "multiple counts" which are identical to the words used by criminal prosecutors, in order to convey a false implication to the reader.  When they made this statement, the Defendants knew that the ordinary reader who was familiar with the priest sexual abuse crisis in America would assume that the Plaintiff had actually been accused by multiple people and had actually been convicted of multiple real crimes of sexual abuse of a minor in a proceeding which was similar to ordinary courts of justice in the United States.  They did this knowing that in fact, none of this was true.  They did this knowing that the sole accuser, Daniel Donohue had at all times denied there was ever any sexual contact by the Plaintiff.

47.    Defendants deliberately withheld the truth that the Plaintiff had actually been found "guilty of the crime" of "handholding in lap during prayer," because they knew that if the general public realized this, the public would never consider this a crime of sexual abuse of a minor even if the church did.  The Defendants also knew that if the public realized the sole accuser had not just "changed" his story but had actually admitted he lied, it would be an entirely different message.  Recognizing this, the Defendants deliberately and with malice constructed and published a statement which was intended to and did suggest and imply that Plaintiff was guilty of the most heinous crime imaginable, on multiple occasions of sexual abuse of a minor as understood in the criminal law.

48.     As a direct and proximate result of Defendants' publication of the false and

defamatory per se statement by implication, the Plaintiff was grievously and irreparably harmed

and his health and reputation was severely damaged.

## COUNT III – DEFAMATION PER QUOD

49.     Plaintiff reasserts and realleges each of the preceding paragraphs as if recited

verbatim herein

50.     As set forth previously, Defendants with malice, issued a press release to all

media on May 1, 2012, and published a statement in Catholic New York on May 3, 2012 which

created an inference in the mind of readers that Plaintiff was a sexual criminal.  The Defendants'

statement, which was made in response to a private letter revelation to the Archdiocese, failed to

reveal that the only person who had ever accused the Plaintiff of sexual abuse admitted he had

lied.

51.     The Defendant's press release was widely distributed in the print media as well as

on the internet.  This statement said that the accuser had "changed' his story and went on to say

that "It should be noted that Mr. Kavanagh was found guilty by a church court of multiple counts

of sexual abuse of a minor."   The general public who read this statement was aware that

hundreds of priests during the last ten years had raped and molested thousands of children.

These facts which were known to the recipients of this published statement would have, and did,

lead the public to conclude that the Plaintiff had committed crimes which were punishable under

the laws of the United States, something which was completely false since the church court

found the Plaintiff only "guilty" of the "crime of handholding in the lap during prayer." By releasing this statement Defendants knew that the readers' knowledge about the multiple crimes by priests would cause the readers to believe that the Plaintiff was a sexual criminal.

52.     The readers of this statement knew that for years the church had done nothing to remove sexual abusers from the priesthood.   Based upon their knowledge of these facts, the readers of this statement would have concluded that since Plaintiff was removed from the priesthood, his alleged "crimes" were even far worse than those of the many priests the church had never removed.

53.     As a direct and proximate result of the Defendants' publication of this statement, Plaintiff was grievously and irreparably harmed and he incurred both general and special damages.

## COUNT IV – LIBEL PER SE

54.     Plaintiff reasserts and realleges each of the preceding paragraphs as if recited verbatim herein

55.     As set forth previously, Defendants with malice, issued a press release to all media on May 1, 2012 and published a statement in Catholic New York on May 3, 2012 which was false and libelous per se which said "It should be noted that Mr. Kavanagh was found guilty by a church court of multiple counts of sexual abuse of a minor."   In fact when the Defendants published these statements, they knew that Plaintiff had only been convicted by a secret church court of a single "count" of the "crime" of "handholding in the lap", and the Defendants further knew there was never any testimony to support the finding of "hand-holding in the lap."

56.     As a direct and proximate result of Defendants' publication of the false and defamatory per se statement the Plaintiff was grievously and irreparably harmed and his reputation was severely damaged.

## COUNT V. – LIBEL PER SE BY IMPLICATION

57.     Plaintiff reasserts and realleges each of the preceding paragraphs as if recited verbatim herein

58.     As set forth previously, Defendants with malice, issued a press release to all media on May 1, 2012 and published a statement in Catholic New York on May 3, 2012 which was false and libelous per se by implication.  The statement which was made in response to a private revelation reporting that the only person who had ever accused the Plaintiff of sexual abuse had admitted he lied.  The statement was widely distributed in the print media as well as on the internet.  The offending statement said that the accuser had "changed' his story and went on to say that "It should be noted that Mr. Kavanagh was found guilty by a church court of multiple counts of sexual abuse of a minor."   The statement deliberately suggested and implied that the Plaintiff, a holy and celibate priest had actually been convicted in a court with due process of "multiple counts" of a loathsome crime of moral turpitude, namely of sexual abuse of a minor.  Defendant deliberately used the words "multiple counts" which are identical to the words used by prosecutors in order to convey a false implication to the reader as to Plaintiff's many acts of vile wrongdoing.

59.     Defendants' issuance of the libelous public press release in response to a private letter is evidence of malice.

60.     Defendants knew this statement was false and completely misleading and they made it intending for it to be widely published in New York, and it was so published.  When they

15

made this statement the Defendants knew that the ordinary reader who was familiar with the priest sexual abuse crisis would believe, based on this statement, that the Plaintiff had actually been accused by multiple victims and had actually been convicted of multiple real crimes of sexual abuse of a minor in a proceeding which was similar to ordinary courts of justice in the United States. The Defendants issued this statement knowing that in fact, this implication was false.

61.    Defendants deliberately withheld the truth that the Plaintiff had actually been found "guilty" in a secret proceeding of the "crime" of "handholding in the lap during prayer," because they knew that if the general public realized this, the public would never consider this a crime of sexual abuse of a minor. The Defendants also knew that if the public realized the sole accuser had not just "changed" his story but had actually admitted he lied, it would be an entirely different message. Recognizing this, the Defendants deliberately and with malice constructed and published a statement which was intended to and did suggest and imply that Plaintiff was guilty of multiple counts of the most heinous crimes imaginable, sexual abuse of a minor.

62.    As a direct and proximate result of the Defendants' publication of the false and libelous per se statement by implication the Plaintiff was grievously and irreparably harmed and his reputation was permanently damaged just at the point when his reputation should have been restored by Donohue's admission to having lied about the infamous trip to Washington.

## COUNT VI. -- LIBEL PER QUOD

63.    Plaintiff reasserts and realleges each of the preceding paragraphs as if recited verbatim herein.

64.     As set forth previously, Defendants with malice, issued a press release to all media on May 1, 2012 and published a statement in Catholic New York on May 3, 2012 which created an inference in the mind of readers that Plaintiff was a sexual criminal with multiple counts of wrong doing.  The Defendants' libelous statement made in response to a private revelation that, Mr. Donohue, the only person who had ever accused the Plaintiff of sexual abuse had admitted he lied, was widely distributed in the print media as well as on the internet.  This statement said that the accuser had "changed' his story and went on to say that "It should be noted that Mr. Kavanagh was found guilty by a church court of multiple counts of sexual abuse of a minor."   The general public who read this statement was aware that hundreds of priests during the last ten years had raped and molested thousands of children.  These notorious facts, which were known to the recipients of this published statement, would have and did lead them to conclude that the Plaintiff had committed multiple crimes which were punishable under the laws of the United States something which was completely false, because in fact, Plaintiff had been found "guilty" of "handholding in the lap during prayer."  By releasing this statement Defendants knew that the readers' knowledge about the multiple crimes by priests would cause the readers to believe that the Plaintiff was a sexual criminal.

65.     The readers of this statement knew that for years the church had done nothing to remove sexual abusers from the priesthood.  Based upon their knowledge of these facts, the readers of this statement would have concluded that the Plaintiff's alleged "crimes" were even far worse than those of the many priests the church had never removed.

66.     As a direct and proximate result of the Defendants' publication of this statement, Plaintiff was grievously and irreparably harmed and he incurred actual damages and required counseling.

17

## COUNT VII.

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

67.     Plaintiff realleges and repeats each of the preceding paragraphs as if repeated verbatim herein.

68.     Defendants' deliberately published a statement which was false and falsely suggested and implied that Plaintiff had actually been found guilty of multiple crimes of sexual abuse of a minor by a court which complied with accepted notions of due process.  They did this knowing that the public would conclude that such a priest was a sexual criminal.  They did this knowing that such was untrue.  Such a statement, which was not only false but which also contained false and misleading implications, was extreme and outrageous and went beyond the bounds of human decency.

69.     Any reasonable person would consider that a priest who actually "was found guilty of multiple counts of sexual abuse of a minor" was a sexual criminal and a pedophile pervert.   Similarly, any reasonable person would consider that any statement by a Defendant which deliberately falsely implied or suggested that this was true, when in fact it was false, would be libelous and damaging.

70.     As a direct and proximate result of this intentional and/or reckless conduct of the Defendants, Plaintiff sustained permanent emotional and physical injuries, including but not limited to anxiety, sleeplessness, gastrointestinal disorders, hypertension, as well as economic injury.

WHEREFORE, Plaintiff, Charles M. Kavanagh hereby prays that this honorable Court enter a judgment against all Defendants in an amount which is just, including punitive damages and attorney fees.

Respectfully Submitted

_/s/ John C. Dearie_
JOHN C. DEARIE   (JD 2816)
LAW OFFICES OF JOHN DEARIE
515 MADISON AVE.
SUITE 1118
NEW YORK, NY 10022
212-980-0404 (PHONE)
212-980-9889 (FAX)
jcd@johndearie.com


_/s/ Thomas A. Boyle, Jr._
THOMAS A. BOYLE, JR. (TB 1633)
LAW OFFICES OF JOHN DEARIE
515 MADISON AVE.
SUITE 1118
NEW YORK, NY 10022
212-980-0404 (PHONE)
212-980-9889 (FAX)
tb@johndearie.com


_/s/ J. Douglas Peters_
J. DOUGLAS PETERS (P 25686)
(PRO HAC VICE FORTHCOMING)
jdpeters@c2law.com


_/s/ Ann K. Mandt_
ANN K. MANDT (P 46314)
(PRO HAC VICE FORTHCOMING)
akmandt@c2law.com

CHARFOOS & CHRISTENSEN, P.C.
5510 WOODWARD AVE.
Detroit, MI 48202
313- 875-8080 (PHONE)
313-875-9857 (FAX)


DATE:  September 13, 2012

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------X
                           :

CHARLES M.KAVANAGH ,        :

       PLAINTIFF ,         :

       –v–                  :                  12- CV-

                           :

JOSEPH ZWILLING, JOHN WOODS,  :        ECF CASE
ARCHDIOCESE OF NEW YORK,    :
and CATHOLIC NEW YORK,      :

                           :

       DEFENDANTS.       :

-------------------------------------------------X

## **DEMAND FOR A JURY TRIAL**

Plaintiff hereby demands a Jury Trial in the above entitled matter.

Respectfully Submitted

   /s/ John C. Dearie
JOHN C. DEARIE (JD 2816)
LAW OFFICES OF JOHN DEARIE
515 MADISON AVE.
SUITE 1118
NEW YORK, NY 10022
212-980-0404 (PHONE)
212-980-9889 (FAX)
jcd@johndearie.com


   /s/ Thomas A. Boyle, Jr.
THOMAS A. BOYLE, JR. (TB 1633)
LAW OFFICES OF JOHN DEARIE
515 MADISON AVE.
SUITE 1118
NEW YORK, NY 10022
212-980-0404 (PHONE)
212-980-9889 (FAX)
tb@johndearie.com

20

_/s/ J. Douglas Peters_
J. DOUGLAS PETERS (P 25686)
(PRO HAC VICE FORTHCOMING)
jdpeters@c2law.com


_/s/ Ann K. Mandt_
ANN K. MANDT (P 46314)
(PRO HAC VICE FORTHCOMING)
akmandt@c2law.com

CHARFOOS & CHRISTENSEN, P.C.
5510 WOODWARD AVE.
Detroit, MI 48202
313- 875-8080 (PHONE)
313-875-9857 (FAX)



DATE:  September 13, 2012

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------X
                                                    :
CHARLES M.KAVANAGH,                                 :
                                                    :
            PLAINTIFF,                               :
                                                    :                    HON. MIRIAM G. CEDARBAUM
            -v-                                      :
                                                    :
                                                    :                        12-CV-        (MGC)
JOSEPH ZWILLING, JOHN WOODS                         :
ARCHDIOCESE OF NEW YORK,                            :
and CATHOLIC NEW YORK,                              :                        ECF Case
                                                    :
            DEFENDANTS.                              :
----------------------------------------------------X

## INDEX OF EXHIBITS

| EXHIBIT | DESCRIPTION |
|---------|-------------|
| 1 | Press Release |
| 2 | Catholic New York Article |
| 3 | Egan Letter |
| 4 | DD Testimony - pp. 117-118 |
| 5 | Donohue Statement |
| 6 | Letter to Dolan |
| 7 | Ari Goldman Affidavit |

1

# EXHIBIT 1

FOR IMMEDIATE RELEASE: May 1, 2012

FOR FURTHER INFORMATION:
Joseph Zwilling
646-794-2997
joseph.zwilling@archny.org

## STATEMENT OF JOSEPH ZWILLING: UPDATE ON CHARLES KAVANAGH

Joseph Zwilling, Director of Communications for the Archdiocese of New York, released the following statement on May 1, 2012, concerning Charles Kavanagh.

"It has come to the attention of the Archdiocese that the victim in the Charles Kavanagh case has changed one of his claims, specifically concerning an overnight trip to Washington, D.C. during the victim's senior year of high school.

It should be noted that Mr. Kavanagh was found guilty by a church court of multiple counts of sexual abuse of a minor, and that this particular trip to Washington was not the basis for the court's decision. Changing this one fact will not have any bearing on the court's ruling, or on its penalty that Mr. Kavanagh be removed from the priesthood and returned to the lay state.

We have shared this statement with the victim in the case, who has agreed to its release, as well as with Mr. Kavanagh's attorneys."

EXHIBIT 2

# CATHOLIC NEW YORK

AMERICA'S LARGEST CATHOLIC NEWSPAPER     MAY 3, 2012     VOL. XXXI, NO. 17     $1.00

## Seven Family Members Killed in Auto Crash On Bronx Parkway

### By JULIANN DosSANTOS

A young Bronx girl preparing to celebrate her first Holy Communion was one of seven family members killed in an automobile accident on the Bronx River Parkway.

Jazlyn Gonzalez, 10, was traveling with her family April 29 on the Bronx River Parkway to a family celebration when the vehicle they were traveling in fell 60 feet from the elevated portion of the highway and landed upside down on the property of the Bronx Zoo below.

A fourth-grader at St. Raymond's Elementary School in the Bronx, Jazlyn was preparing to celebrate her first Communion on Saturday, May 5. Msgr. John Graham, pastor of St. Raymond's parish and regional vicar of the East Bronx, called the accident "an obvious tragedy."

Referring to young Jazlyn, just days away from receiving her first Communion, he said, "Now, she is able to be with Jesus rather than receive Jesus."

Maria Nunez-Gonzalez, Jazlyn's mother, was the driver of the white 2004 Honda Pilot. Driving southbound in the left lane, she lost control of the vehicle and it flew over the four-foot guardrail.

The portion of the highway where the accident occurred has been the site of several major accidents in recent years, including at least one in 2006 in which six people died.

The southbound Bronx River Parkway near the location of the accident was listed on a state report last year detailing the worst five percent of problem roads in New York.

In a brief news conference after the accident on Sunday, FDNY Deputy Chief Ronald Werner said, "Sometimes you come upon events that are horrific, and this is one of them."

All seven passengers in Sunday's crash were killed upon impact.

Also in the vehicle were Jazlyn's grandparents, Jacobo Nunez and Ana Julia Martinez, who had recently arrived from their home in the Domini-

(Continued on Page 25)



Maria R. Bastone

## STUDENT STRENGTH

Kerry Fenn of The Ursuline School and Danny Osso of Salesian High School are building a playhouse for children at S.A.I.L. (Salesian Alternative Interactive Learning) at Ferncliff Manor in Yonkers, April 21. The students were participating in "Make a Difference Day," hosted by Iona Preparatory School in New Rochelle. The event involved 100 Catholic students from four schools in New Rochelle: Iona Prep, Ursuline, Salesian and Blessed Sacrament–St. Gabriel. The students were divided into four work sites. Other students worked in construction at Habitat for Humanity, volunteered at the HOPE Community Services food pantry, and cleaned a field for New Rochelle Little League.

## INSIDE THIS ISSUE

**Catholics in Health Care Have Manhattan Home**
Page 3

**Seminary Partnership Well Under way**
Centerfold

**Cardinal Dolan is Truly 'Influential'**
Page 4

Cardinal's Column ............ Page 5
Editor's Report .................. Page 13
Editorial ........................... Page 12
Letters ............................. Page 12
Páginas en Español ....... Pages 21-22
Out & About ............... Pages 31-32

VISIT US ONLINE AT
**WWW.CNY.ORG**

## re-Planning:

...elieves the burden from
...ur loved ones
...ur wishes fulfilled
...ves money as prices
...crease yearly
...year, interest-free payment
...an available on crypts

...ndividuals and families are
...uraged to consider including
... need burial arrangements as
...rt of their estate planning

...et your Catholic Faith
...eplace fear with hope,
...eath with resurrection

005601

ESSYDYO1009-P7
MRS ELLEN SNYDR
12 STUYVESANT APT 5C
NEW YORK NY 10001
P451 P283
52012

# Month's Mind Mass May 11 For Msgr. Clark

A Month's Mind Mass for Msgr. Eugene V. Clark, former rector of St. Patrick's Cathedral, will be offered at St. Agnes Church, 143 E. 43rd St. in Manhattan, on Friday, May 11, at 10 a.m.

Msgr. Robert T. Ritchie, rector of St. Patrick's Cathedral, will be the celebrant. Father George W. Rutler, pastor of Our Saviour parish in Manhattan, will be the homilist.

A notice from the Office of the Vicar General April 25 said that "it had just come to the attention of the archdiocese" that Msgr. Clark had died on April 11 and was buried the following day. Msgr. Clark was 86 at the time of his death.

Msgr. Clark had served as rector of St. Patrick's Cathedral from 2001 until August 2005, when he resigned amid allegations that he had an affair with his longtime secretary. Both Msgr.

Clark and the woman denied the accusations at the time.

Before his assignment at the cathedral, Msgr. Clark was pastor of St. Agnes, from 1986 to 2001. He oversaw construction of a new church there after fire gutted the former church in 1992.



Msgr. Eugene V. Clark

Msgr. Clark served as pastor of Annunciation parish in Crestwood, 1981-1986.

He was director of communications in the archdiocese, 1971-1980, and earlier served as secretary to Cardinal Terence Cooke and Cardinal Francis Spellman.

He earlier served as a faculty member at Cardinal Spellman High School, the Bronx, and the former Dubois High School, Manhattan, and was a professor at the former Notre Dame College on Staten Island. He was a parochial vicar at St. Francis of Assisi parish in Mount Kisco, and was an advocate and then judge on the Metropolitan Tribunal.

Born in the Bronx, he studied at Cathedral Prep and Cathedral College before completing his studies for the priesthood at St. Joseph's Seminary, Dunwoodie. He was ordained in 1951 and named a monsignor in 1965.

He held a master's degree from Fordham University and a doctorate from the University of Notre Dame, both in European history.

## Auto Crash...

*(Continued from Page 1)*

can Republic for a month-long visit with their family in New York.

Jazlyn's aunt, Maria Nunez Rosario, was also in the vehicle with two of her daughters, 7-year-old Naily and 3-year-old Marlyn Rosario.

Two older brothers survive Jazlyn, one is a seventh-grader at St. Raymond's Elementary School, and the other is a recent graduate of St. Raymond High School for Boys.

Jazlyn's father, Juan Gonzalez, is a livery cab driver. Her mother was a custodial worker at Fordham University. Maria Nunez also worked as a custodian at Fordham University.

Msgr. Graham told CNY that Jazlyn's family worked hard to provide their children with a Catholic educa-

tion. "They are a hard-working family," he said.

Maria Nunez and her daughters were parishioners at St. Lucy's parish in the Bronx. Naily was a first-grade student at St. Lucy's School. Newspapers reported that visible among the wreckage was a school workbook belonging to Naily.

The Archdiocese of New York sent grief counselors to both St. Lucy's School and St. Raymond's Elementary School to work with classmates and faculty there.

The pastor of St. Lucy's, Father Nikolin Pergjini, described Naily as a "very kind and very humble" girl.

"They came to family Mass every Sunday," said Father Pergjini of the family.

A Funeral Mass for all the victims was to be offered Friday, May 4, at 9:45 a.m., at St. Raymond's Church.

## Statement on Charles Kavanagh

*Joseph Zwilling, director of communications for the Archdiocese of New York, released the following statement on May 1, concerning Charles Kavanagh, a former priest of the archdiocese who was dismissed from the priesthood in 2010.*

"It has come to the attention of the Archdiocese that the victim in the Charles Kavanagh case has changed one of his claims, specifically concerning an overnight trip to Washington, D.C., during the victim's senior year of high school.

"It should be noted that Mr. Kavanagh was found guilty by a Church court of multiple counts of sexual abuse of a minor, and that this particular trip to Washington was not the basis for the court's decision. Changing this one fact will not have any bearing on the court's ruling, or on its penalty that Mr. Kavanagh be removed from the priesthood and returned to the lay state.

"We have shared this statement with the victim in the case, who has agreed to its release, as well as with Mr. Kavanagh's :005602's."

## Sister Jeremie, Miss

Sister Marie Jeremie Crowley, M.M., a pioneering missioner to Bolivia, died at Maryknoll Sisters Residential Care IV on April 21. She was 95.

She was one of the first Maryknoll sisters assigned to Bolivia in 1943, serving as a lab worker at Riberalta Hospital from 1943 to 1951. During that time she also worked as secretary to Maryknoll Bishop Alonso Escalante. In 1951 she was named superior of the Maryknoll Sisters serving in Cobija and principal of the village's mission school, positions she held until 1958.

She then moved to Montero, where she served as superior to the sisters working in that community and principal of the mission school, 1958-1959. She was appointed superior for the Maryknoll Sisters in Riberalta and Riberalta School in 1959, holding both positions until 1962. She then became religious education coordinator of public schools in Azangaro, a position she held until 1968 followed by four years teaching catechetics and general education in Cochabamba until 1972.

She then returned to the United States to work as a secretary at the Maryknoll Sisters Center in Ossining. She was assigned to Arequipa, Peru, in 1974 to serve as a religious education coordinator for 10 primary schools while also doing catechetical and pastoral work until 1978. She then relocated to Santiago, Chile, where she served as a Maryknoll house administrator, 1979-1980. That was followed

# EXHIBIT 3



November 8, 2005

Your Excellency:

    Enclosed please find two letters which I wish to bring to your attention and which I would ask that your staff add to the file of the case of Reverend Monsignor Charles M. Kavanagh. For three years, I have been subjected to this kind of abuse, and have not fought back. My advisors feel that we cannot allow this situation to continue. Reverend Monsignor Charles J. Scicluna of your staff will be able to clarify the matter. At no time did I oppose the appointment of a lawyer for Monsignor Kavanagh. I made it crystal clear in writing that I would be willing to do whatever the Congregation permitted me to do.

    Inasmuch as the Holy Father and His Excellency, The Most Reverend Angelo Amato, SDB, are aware of this case in some detail, I am sending to them a copy of this letter of mine to you.

    With prayerful best wishes and kindest personal regards, may I remain

                Very truly yours in Christ,

                Edward Cardinal Egan
                Archbishop of New York

His Excellency
Most Reverend William J. Levada
Prefect, Congregation for the Doctrine of the Faith
Palazzo del S. Uffizio, 11
00193 Rome
ITALY

Encl.

cc: √Monsignor Charles Kavanagh
    Monsignor Desmond O'Connor

# EXHIBIT 4

*After the recess called for by the Presiding Judge, the interview continued as follows.*

**Since you also had been describing**
Could you give me just one more minute?

**Sure**
Thank you.

**Since you had been describing that there were things that preceded that particular moment and you describe things like hand holding, hugging, cuddling and so forth. Could you describe when that kind of, and you've used the word typicality that is your own expression, could you explain for us when those gestures, when those kinds of physical contact from Monsignor Kavanagh to you began, how early on in time at Prep, and if you could just describe over time because I have the impression what you are trying to tell us is that over time it started, it developed and so forth. However you want to describe that for us.**
Again it was part of the culture. I hugged my uncles and my uncles would slap my hand away if I would shake it would pull me in and give me a big kiss. I hugged my father. I hugged my mother and my brothers and sisters. I did not hug Charlie Kavanagh. He wasn't a person that you wanted to hug. He didn't know what that meant. He didn't have experience of it. A hug with him was like coming into a brick wall. So, he would go to hug me but there was usually the hand and pulling me but he would want to hug and that is how the hug would happen.

~~Handholding, we would drive down an hour drive on Sunday night and I remember explicitly him saying to me, "let's pray."~~ He had never prayed with me. He had never said let's pray. I'm sitting there and I carried rosary beads in my pocket and I am thinking are we going to say the rosary or what are we going to do but ~~I didn't say anything and he reached out his hand and took my hand.~~ He sat there driving, tapping his foot, talking and holding my hand going along. I didn't know if he was lost in some spiritual place, I don't know. Then this became what we did and there wasn't even an invitation to prayer. I was just an ~~expectation he put his hand out and I was going to hold it. It was a small were a two door car, so there was no big console between us so we would hold hands and sometimes our hands would be on his side or he would put them over on my side.~~ I didn't like it. It wasn't any idea of sense of prayer to me that I understood. I was not comfortable with it. But, he was the priest, he was the director.

He asked me to be my spiritual director and he asked me to be my confessor. He would come to me and say, "would you like to go to confession". He knew that I loved the Sacrament of Confession but he would say, "would you like to do that now?" He would pull up in front of my home and park down the block and say, "would you like to do confession." Then he would hold my hand

24

W-119

through confession. In the room, his room, there was a couch and there was a loveseat in an L-shape before the television. I would sit on his loveseat and he would sit next to me and he would lean in and sometimes put his head on my shoulder. He would take my hand; my hand would be in my lap. I just felt frazzled and I was uncomfortable and I didn't like it. Then when it happened on the couch, I shut down.

**When was the first time when you described driving in the car when he invited you to pray and he took hold of your hand?**
I think it was the end of my sophomore year but I am not certain and I know that at the end of my sophomore year there were times that I described the darkness coming in. So, I think it started to happen then.

**At various time, you used the expression cuddling. What's your understanding of that word so we know what your understanding is?**
It might be a misuse of a word because I cuddle with my wife, I cuddle with my kids. So, that's a very full-bodied, mutual experience. I had put cuddling whenever I write it in quotation marks which I would never do if I was talking about my wife or my children. So, the cuddling is that meeting and that casual, that laying down, the head on my shoulder that kind of close physical proximity. There was never engaged like in a mutual kind of way because that's what I speak to when I use the word cuddling.

**You reported that Father Kavanagh having looked at you through a keyhole in a door. Could you talk about that and when that first occurred and where, etc?**
You may want to hold that question until later only if we want to speak chronologic and chronologically.

**Not necessarily, as long as you clarify when it occurred?**
Because there is some distinctions that I make in my head.

**Well if you prefer to do it that way that's fine I can hold it.**
Yeah because the hotel incident happened in between those and one I don't know just for the sake of telling it.

**I'd like to cover the incident with regard to the hotel room and then we'll go to the other thing and then the final different other questions. Before we actually talk specifically about the incident that you reported at a hotel room I just want to ask you to put things in context for our understanding. Was it a practice for students from the Prep to take overnight trips with faculty members?**
No. My family was very much into the Right for Life Movement and going down to marches. I was a senior in high school and I had heard—as difficult as going home was I loved going home, I loved seeing my family and whenever it was time to leave siblings were going back to their jobs or colleges it really was a

25

005604

W-120

heart break for me. I really missed them. So it just occurred to me that I think Patricia had mentioned that they were going down to the Right for Life and so school started back up the 7th-8th of January and that was just a couple of weeks away so I just prepared that I could go down. Noted I would miss school but it was something that was on the radar screen so I talked to a couple of my friends, I think it was Kevin and Larry and we were all living at Ford House and said do you guys want to go down? I think I was thinking that Larry had a car and he could take us down and I knew he would be able to get permission. So I'm not sure if we had gotten permission first or were getting permission from Kavanagh but my sense is that we had gotten permission somehow and this was going to happen. Kavanagh said oh I'll drive you guys down and I was taken aback because I looked back on it now and it was just not part of his politics the Right for Life March. It certainly wasn't an activity that I thought he would have participated in. So ok we went down and unfortunately I wanted to look for my siblings but that didn't come to fruition. We weren't with Kavanagh I think he went off I'm not sure at the march. Then the march was done and I forget how long it is from Washington to New York City but we had come down that morning with the intention that we were going to go back that night. Father Kavanagh said well we'll just spend the night down here, we'll spend the night. He rented a hotel room, he rented two rooms and he and I slept in one and Kevin and Larry slept in the other. This was after the couch incident so I was so on guard, I was scared, I was nervous and I was bitter towards him and he knew it. He also knew that graduation was coming so there was this tension and I understand that now, I wasn't aware of it then. We got into bed. He got in his bed and I got in mine, we could only sleep in our underwear unless we were going to sleep in our clothes. He had a t-shirt on and boxers and I had briefs on and a t-shirt and I remember being very aware of him that night and any movement and anything going on. In the morning I heard him get up and I heard him going to the bathroom and I was just laying there listening and I was awake and I knew he was in there and then I realized I was thinking about other things I realized he had been in there for a long time and I haven't heard anything so that made me even more aware. Then I heard the bathroom door open and I could hear him walk out and then it was quiet. I think I was on my stomach or on my side and I raised my head up to look and see and he was standing over by the bathroom in his t-shirt and his boxers and the aperture of the hole to his boxers was open and all I remember is just darkness inside the hole and I just ducked my head down immediately curled into a ball and I was ducking I could see him starting to move and I heard him run across the room and jumped into bed and got the covers and fixed them over us and started as I said before doing whatever he was doing back there but he maneuvered his body against mine. I was a mixture of being shutdown and enraged and in this state there was a knock on the door and the door was actually open and he just jumped out of the bed and said we're in here, we're in here and whoever was at the door and I assume it was a chambermaid said ok thank you and then that was it. I think I stayed under the covers and nothing was pursued after that. Then we got up and got ready and left.

# EXHIBIT 5

My name is Daniel Donohue.  Ten years ago in 2002, and in the years thereafter, I accused Msgr. Charles Kavanagh of having sexually abused me as a minor.

Specifically, I accused him of getting into my bed and pressing his body against me on a trip to a Right to Life March in Washington D.C. while I was a senior in high school.

This statement was not true and I apologize for it.

I did not go on any such trip with Msgr. Kavanagh while I was in high school.

Msgr. Kavanagh has been a positive force for good in the church and community and has helped thousands of young people.

I have never intended that the church would deprive him of his ministry and I hope the church will reexamine this decision and process.

_Daniel C Donohue_
Daniel Donohue

DATE: _4.26.12_

Before   Michael P. Hogan
U.S. Dist. Judge



EXHIBIT 6.



# CHARFOOS & CHRISTENSEN, P.C.

ATTORNEYS AND COUNSELORS AT LAW

THE HISTORIC HECKER-SMILEY MANSION

5510 WOODWARD AVENUE, DETROIT, MICHIGAN 48202  (313) 875-8080  FAX NO. (313) 875-8522

www.c2law.com

SAMUEL CHARFOOS (1908-1995)
DAVID W. CHRISTENSEN*
J. DOUGLAS PETERS*
DAVID R. PARKER*
MARY PAT ROSEN**
ANN K. MANDT*
SANDRA J. RENARD

OF COUNSEL
THADDEUS J. KEDZIERSKI, JD, CPA
RICHARD A. LENTER
JOHN DAVID SIMPSON

*ALSO ADMITTED TO PENNSYLVANIA BAR
**ALSO ADMITTED TO ARIZONA BAR

April 30, 2012

His Eminence
Timothy Cardinal Dolan
Archbishop of New York
1011 First Ave.
New York, NY 10022

**VIA HAND DELIVERY & UPS OVERNIGHT**

Your Eminence,

We have very good news regarding Msgr. Charles Kavanagh who was wrongfully de-frocked based on a single sexual abuse complaint filed by his former student, Daniel Donohue.  No other complainants have come forward since Mr. Donohue's 2002 and subsequent media complaints and press conferences.

On April 26, 2012, Mr. Donohue admitted his complaint against Msgr. Kavanagh "was not true", and he apologized for making it.

In March, 2011, attorneys for Charles Kavanagh filed a defamation lawsuit against Daniel Donohue who made false allegations of sexual abuse against Msgr. Kavanagh in 2002 in the Manhattan Federal Court. Specifically, he accused Msgr. Kavanagh of having taken him to a Right to Life March when he was a senior in high school and then claimed that the Monsignor climbed into bed with him wearing only his underwear and pressed up against him.  As you are aware, as a result of Mr. Donohue's allegation, the Church removed Msgr. Kavanagh from ministry in December, 2011.

On April 26, 2012, in front of United States District Court Judge Michael Hogan, Mr. Donohue admitted he lied.  Enclosed is the retraction signed by Mr. Donohue in Federal Court.  The transcript of this statement has been placed on the record and received in the Federal Court of New York.

Page 2


Since the Archdiocese of New York was the first to publicly release the allegations against Msgr. Kavanagh, we offer the Archdiocese the opportunity to be the first to release the news that Mr. Donohue has now admitted he lied. By doing so, the Archdiocese will have an opportunity to take the lead in informing the public about this significant development. We are confident that by doing so, you will enhance the public's perception of the Church's interest in justice. If the Archdiocese decides to release this new information we would be grateful if you would notify us as to when and how that announcement will be made. If the Archdiocese decides not to release the statement, we will make a public announcement. Please advise us if we of how you wish to proceed.

Very truly yours,

J. Douglas Peters, Esq.

Ann K. Mandt, Esq.
Charfoos & Christensen, P.C.
550 Woodward Ave.
Detroit, MI 48202
313-875-8080 or 248-613-5709


AKM/cmf

cc:    James McCabe, Esq.

**EXHIBIT 7.**

## AFFIDAVIT

STATE OF NEW YORK    )
                                        ) SS
COUNTY OF  *BRONX*  )


1.   My name is Ari L. Goldman.  I am a tenured professor at the Columbia University
     Graduate School of Journalism.  Prior to my coming to teach at Columbia, I was
     a reporter at the New York Times for 18 years and for 10 of those years I wrote
     about religion.

2.   At Columbia, I run the Scripps Howard Program in Religion, Journalism and the
     Spiritual Life.  For the last 19 years I have taught a course called "Covering
     Religion."

3.   I routinely see press releases from a wide array of religious organizations.  I
     consider myself an expert in evaluating their meaning.  I have read the statement
     signed by Daniel Donohue which was provided to the Archdiocese of New York
     and the Archdiocese's press release issued in response.  I understand that this
     statement was also published in Catholic New York.

4.   My expert opinion of the press release issued by the Archdiocese of New York
     on 5/1/12 which was also published in Catholic New York is as follows:

     a.   A good press release makes a specific point and makes that point clear
          from the headline to the body of the text.  This press release is highly
          ambiguous and even deceptive.  It does not inform the reader that this
          release is being issued in response to the Archdiocese's discovery that
          the sole accuser in the Kavanagh case signed a statement admitting he
          lied.  Nor does it inform the reader that this accuser actually affirmed the
          positive impact Kavanagh had on the lives of thousands and that he
          hoped that the church would re-examine its decision to remove Kavanagh
     from the priesthood since the accuser never intended that to happen.

     b.   The press release seems to make one point and then veers to just the
          opposite conclusion. The implication left at the end is a very negative one.

1

c.  The headline – Statement of Joseph Zwilling: Update on Charles Kavanagh - does not tell the reader what to expect.  Is it something positive or negative?  That is unclear and it completely omits any mention of the reason for its issuance, which was its knowledge that Kavanagh's accuser admitted he had not been truthful.

d.  The statement itself begins by saying that "the victim" has "changed" his claim.  It seems at first that there may be exculpatory facts here thatwould clear Kavanagh or at least minimize his crime.  Certainly to be entirely truthful it should inform the reader that the accuser had not merely "changed" a claim, he admitted he lied.

e.  The next paragraph does a complete turnaround by noting that Kavanagh's guilty verdict by a "church court of multiple counts of sexual abuse of a minor" still stands.  Making matters worse, it ends with a reference to a "court" implying to the reader that a criminal court ruling was involved here too. It does not inform the reader that this church court was a secret proceeding during which Kavanagh was not permitted to be present during testimony and his attorney was not permitted to ask questions.

f.  The use of the language "multiple counts of sexual abuse of a minor" which is language used by criminal prosecutors, implies to the reader that Kavanagh was actually found guilty of crimes of sexual abuse as understood in the criminal justice system such as rape or molestation. This is particularly true because the average reader would undoubtedly be      familiar with the sex abuse scandal in the Catholic Church in which hundreds of priests were found to have raped and/or molested thousands of children over decades.

g.  The statement concludes by saying that Kavanagh's penalty (removal from the priesthood) which is the harshest penalty the church can impose remains.  The press release is highly confusing.

h.  In the end, however, it leaves a very negative impression of Kavanagh and creates an implication that Kavanagh was actually a sex abuser as commonly understood by the general public.

i.  The reader wonders why this was issued at all.  Without having the information that the accuser had actually admitted he lied and that he

2

hoped the church would re-consider its actions against Kavanagh, the only logical conclusion for the average reader is that Kavanagh is actually guilty of criminal sexual conduct and this new information does not change that.

ARI L. GOLDMAN

DATED: 7/8/12

Subscribed and sworn to before me
this 2nd day of _____ July _____, 2012.

Notary Public
_____ Bronx _____ County, State of NY
My commission expires: 3/31/15

DIANE ZILZ
NOTARY PUBLIC STATE OF NEW YORK
BRONX COUNTY
LIC. #01ZI6237400
COMM. EXP. 3/31/15