UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

CHARLES M. KAVANAGH,

                       Plaintiff,

         -v-

JOSEPH ZWILLING, et al.,

                     Defendants.

-------------------------------------------------------------------X

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 02/14/2014
```

12 Civ. 7062 (JMF)


OPINION AND ORDER

JESSE M. FURMAN, District Judge:

       Plaintiff Charles Kavanagh is a former Catholic priest who was defrocked after being found guilty in a secret church trial of the ecclesiastical sin of sexual abuse of a minor. (Compl. (Docket No. 1) ¶¶ 1, 29, 30). After his conviction, Plaintiff pursued a defamation claim in this Court against his accuser, Daniel Donohue, which resulted in a settlement pursuant to which Donohue signed a statement changing one aspect of his prior testimony. Thereafter, the Archdiocese of New York (the "Archdiocese") issued a press release acknowledging the change in Donohue's account, but stating that Kavanagh had been "found guilty by a Church court of multiple counts of sexual abuse of a minor" and that the change in Donohue's testimony had no "bearing on the court's ruling, or on its penalty that Mr. Kavanagh be removed from the priesthood and returned to the lay state." (Compl., Ex. 1). The press release was printed in full in the Archdiocese's newspaper, *Catholic New York* ("*CNY*"). (Compl., Ex. 2, at 2).

       In this suit, Kavanagh brings libel claims against the Archdiocese and its Director of Communications, Joseph Zwilling, as well as *CNY* and its Editor-in-Chief, John Woods, alleging that the press release defamed him by falsely suggesting that he was found guilty of multiple counts of sexual abuse, by falsely implying that he was found guilty in a civil court, and by

falsely leading people to believe that he had been convicted of abusing more than one minor.

Pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure, Defendants now

move to dismiss the Complaint in its entirety.  Their principal argument is that adjudicating

Kavanagh's claims would require the Court or a jury to "interpret canonical procedure,

standards, and decisions; assess church law and doctrine; examine and assess the evidence

presented in the prior canonical proceedings; and thereby impermissibly entangle itself in matters

of the ecclesiastical hiring and firing of a church's ministers, all of which would violate the

religious liberty clauses to the First Amendment."  (Mem. Law Supp. Defs.' Mot. To Dismiss

Compl. and Mot. To Seal (Docket No. 11) ("Defs.' Mem.") 3).  The Court agrees that proceeding

with Plaintiff's primary claim would violate the First Amendment.  For that reason, and for the

other reasons discussed below, Defendants' motion to dismiss is GRANTED.

## BACKGROUND

The following facts, which are taken from the Complaint and documents it references, are

construed in the light most favorable to Plaintiff.  *See, e.g.*, *Aurecchione v. Schoolman Transp.*

*Sys., Inc.*, 426 F.3d 635, 638 (2d Cir. 2005).[1]

Kavanagh, now a resident of Florida, was an ordained Catholic priest in New York.

(Compl. ¶ 1).  In May 2002, Donohue contacted Edward Cardinal Egan — then the Archbishop

of New York — and claimed that, over twenty years earlier, he had been sexually abused by

---

[1]     As discussed below, *see infra* note 7, it is somewhat unclear whether Defendants' First
Amendment argument is properly considered under Rule 12(b)(1) (in which case, the Court may
rely on evidence outside the pleadings and inferences would not be drawn in Plaintiff's favor,
*see, e.g.*, *Morrison v. Nat'l Austl. Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008), *aff'd on other
grounds*, 130 S. Ct. 2869 (2010)) or Rule 12(b)(6) (in which case, the Court would be limited to
the Complaint and documents referenced in it and would be required to draw all inferences in
Plaintiff's favor, *see, e.g.*, *Holmes v. Grubman*, 568 F.3d 329, 335 (2d Cir. 2009)).  In this case,
the Court's analysis and conclusion would be the same under either Rule.  Accordingly, out of an
abundance of caution, the Court will apply the more Plaintiff-friendly standards of Rule 12(b)(6).

Kavanagh while he was a student at Cathedral Preparatory Seminary ("Cathedral Prep"), where Kavanagh had been a teacher.  (Compl. ¶¶ 9, 11).  Donohue cited two incidents: one when Kavanagh had "jumped on him and rubbed his face on Donohue"; and one when Kavanagh, wearing only underwear, got into bed with Donohue and rubbed up against him.  (Compl. ¶ 10).  According to Donohue's original account, the latter incident occurred on a school field trip to a Right to Life March in Washington, D.C. during his senior year in high school.  (*Id.*).  Kavanagh denied that he had ever sexually abused Donohue or anyone else.  (Compl. ¶ 13).

Shortly after Donohue's informal complaint, Cardinal Egan ordered Kavanagh to vacate his residence at St. Raymond's Church and told him that he was prohibited from acting as a priest in light of the accusation.  (Compl. ¶ 11).  The Archdiocese also informed the media of Kavanagh's suspension.  (*Id.*).  According to Kavanagh, that was the first time the Archdiocese had ever made a public announcement regarding a sexual abuse accusation against a priest.  (*Id.*).  Between May 25, 2002, and December 2010, the press published "multiple" stories regarding the accusations against Kavanagh.  (Compl. ¶ 14).

In August 2003, Cardinal Egan told Kavanagh that he was recommending that Kavanagh be permanently removed from the priesthood.  (Compl. ¶ 16).  Cardinal Egan asked Kavanagh to consent to such removal, but Kavanagh refused and indicated he would contest any attempt to remove him.  (*Id.*).  Sometime thereafter, the Archdiocese referred Kavanagh's case to the Congregation of the Doctrine of the Faith, in Rome.  (Compl. ¶¶ 17, 20).  (Kavanagh alleges that, after the case was referred to the Vatican, Cardinal Egan "attempt[ed] to prejudice the Congregation" by writing a letter to William Cardinal Levada, its prefect, "claiming that [Kavanagh] was 'abusing' him[,] i.e.[,] Cardinal Egan."  (Compl. ¶ 20).)  In January 2006, the Congregation denied Cardinal Egan's request to summarily defrock Kavanagh, and instead

3

called for a secret, canonical trial to take place in Erie, Pennsylvania.  (Compl. ¶ 21).[2]

The canonical trial began in November 2006.  (Compl. ¶ 22).[3]  Three priests served as

judges.  (Compl. ¶ 24).  Allegedly, neither Kavanagh nor his attorney was allowed to review the

evidence against him before the trial began.  (*Id.*).  Witnesses swore an oath to tell the truth; they

also took a vow of secrecy on pain of excommunication.  (Compl. ¶¶ 24-25).  At trial, there was

conflicting evidence about whether Donohue had attended the Right to Life March while he was

in high school: Donohue himself testified that he had, while other students and teachers testified

that no students from Cathedral Prep had attended the rally.  (Compl. ¶¶ 25-26).  One of

Donohue's classmates at Cathedral College testified that he and Donohue, accompanied by

Kavanagh, had attended a Right to Life March during his and Donohue's sophomore year of

college.  (Compl. ¶ 27).  Kavanagh sought to use this evidence to show that whatever events

might have taken place occurred while Donohue was an adult.  (*See id.*).

The canonical court issued its opinion, totaling thirty-six pages, on November 12, 2008.

(Compl. ¶ 29).  Its findings are heavily disputed and at the heart of this motion.  According to the

Complaint, the canonical court credited Donohue's testimony that he had attended the Right to

Life March with Kavanagh while he was in high school, and found Kavanagh guilty of "one

count" of sexual abuse of a minor.  (Compl. ¶ 30).  Defendants vigorously contest this

characterization of court's decision, however, claiming that Kavanagh was found guilty of

"multiple counts, or 'delicts' of sexual abuse of a minor under the age of sixteen," in violation of

---

[2]     In this Opinion, the term "canon" (and its derivatives) refers to the body of Catholic
ecclesiastical law governing internal church proceedings.

[3]     The trial was preceded by the issuance of a *libellus*, a type of charging document used by
the Catholic Church under canonical law.  (Compl. ¶ 22).  Although not relevant to the present
motion, the *libellus* included allegations made by another former student of Kavanagh's at
Cathedral Prep.  (*Id.*).  According to the Complaint, that other accuser was discredited, and the
Church court did not find Kavanagh guilty of abusing him.  (Compl. ¶¶ 22, 29).

the Sixth Commandment.[4]  (Defs.' Mem. 7; *see also* Welch Decl. ¶ 7).  In either case, the

canonical court decreed that Kavanagh should be removed as a priest.  Kavanagh appealed to a

reviewing church court comprised of another three priests, which, in September 2010, affirmed

in a secret opinion totaling thirteen pages, and Kavanagh was defrocked.  (Compl. ¶¶ 30, 32).[5]

      During the canonical court proceedings, Donohue's statements about when the trip to the

Right to Life March occurred were published in various media outlets, including *The New York

Post* and *The Journal News*.  (Compl. ¶ 31).  On March 26, 2011, almost eight months after the

appellate decision affirming his conviction and removal, Kavanagh filed suit in this Court against

Donohue for defamation, on the grounds that Donohue's statements about when the trip occurred

were false.  (Compl. ¶ 33).  On April 26, 2012, the Honorable Michael Hogan of the United

States District Court for the District of Oregon mediated the dispute.  (Compl. ¶ 34).  As a result

of that mediation, Donohue admitted that the trip to Washington had not occurred while he was

in high school, and he signed a statement to that effect.  (*Id.*; Compl., Ex. 5).

      Three days later, in an apparent attempt to have himself reinstated to the clergy,

Kavanagh wrote a "private letter" to Timothy Cardinal Dolan — Cardinal Egan's successor —

informing him of Donohue's signed statement and offering the Archdiocese "a chance to be the

first to announce [Donohue's] significant retraction."  (Comp. ¶ 35).  Suffice it to say that

Kavanagh's letter did not have its intended effect; instead, the Archdiocese issued the press

release that is subject of this lawsuit.  (Compl. ¶ 36).  That release, which appeared in the May 3,

2012 edition of *CNY* and was signed by Defendant Zwilling, read in full as follows:

---

[4]     A "delict" is a crime under canon law.  The Sixth Commandment of the Decalogue reads:
"You shall not commit adultery."  *Exodus* 20:14 (New Revised Standard Version).

[5]     As discussed below, both canonical court decisions have been placed under seal in this
proceeding.  The trial court's decision is cited herein as "Decision."

It has come to the attention of the Archdiocese that the victim in the Charles Kavanagh case has changed one of his claims, specifically concerning an overnight trip to Washington, D.C., during the victim's senior year of high school.

*It should be noted that Mr. Kavanagh was found guilty by a Church court of multiple counts of sexual abuse of a minor*, and that this particular trip to Washington was not the basis for the court's decision. Changing this one fact will not have any bearing on the court's ruling, or on its penalty that Mr. Kavanagh be removed from the priesthood and returned to the lay state.

We have shared this statement with the victim in the case, who has agreed to its release, as well as with Mr. Kavanagh's attorneys.

(Compl., Ex. 2, at 2 (emphasis added); *accord* Compl., Ex. 1).

On September 19, 2012, Kavanagh filed the Complaint in this case (Docket No. 1), asserting claims of libel *per se*, libel *per se* by implication, and libel *per quod*.  (Compl. ¶¶ 54-66).[6]  Defendants moved to dismiss the Complaint on November 9, 2012 (Docket No. 9), and the Honorable Miriam Goldman Cedarbaum — to whom this case was previously assigned — held oral argument on the motion on December 6, 2012 (Docket Entry, Minute Entry, Dec. 6, 2012). The case was transferred to the undersigned on November 21, 2013.  (Docket Entry, Notice of Case Reassignment, Nov. 21, 2013).

---

[6]     The Complaint includes separate claims of defamation *per se*, defamation *per se* by implication, and defamation *per quod*.  (Compl. ¶¶ 41-53).  As libel is a species of defamation, *see, e.g.*, *Church of Scientology Int'l v. Behar*, 238 F.3d 168, 173 (2d Cir. 2001), these claims are duplicative of Plaintiff's libel claims and not addressed separately.  The Complaint also includes a claim for intentional infliction of emotional distress, but Plaintiff withdrew that claim at oral argument.  (Docket No. 18, at 5:11-21).  Accordingly, it no longer remains in the case. *See, e.g.*, *Hoepker v. Kruger*, 200 F. Supp. 2d 340, 344 n.4, 355 (S.D.N.Y. 2002).

## APPLICABLE LAW

### A.  Rule 12(b)

As noted, Defendants' motion is brought pursuant to Rules 12(b)(1) and 12(b)(6).  "A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it."  *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000).  "When considering a motion to dismiss for lack of subject matter jurisdiction or for failure to state a cause of action, a court must accept as true all material factual allegations in the complaint."  *Shipping Fin. Servs. Corp. v. Drakos*, 140 F.3d 129, 131 (2d Cir. 1998).  The plaintiff, however, "bear[s] the burden of showing by a preponderance of the evidence that subject matter jurisdiction exists . . . and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it."  *APWU v. Potter*, 343 F.3d 619, 623 (2d Cir. 2003) (internal quotation marks omitted).  Moreover, a court "may consider affidavits and other materials beyond the pleadings to resolve the jurisdictional issue."  *J.S. ex rel. N.S. v. Attica Cent. Schs.*, 386 F.3d 107, 110 (2d Cir. 2004).

By contrast, a Rule 12(b)(6) motion tests the legal sufficiency of a complaint and requires a court to determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a plausible claim for relief.  *See, e.g.*, *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).  When ruling on a Rule 12(b)(6) motion, a court must accept the complaint's factual allegations as true, drawing all reasonable inferences in the plaintiff's favor.  *See, e.g.*, *Holmes*, 568 F.3d at 335.  To defeat the motion, however, the plaintiff must plead sufficient facts "to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S.

at 678 (citing *Twombly*, 550 U.S. at 556).[7]

## B.  Defamation

"The law of defamation serves to protect an individual's right to one's reputation."

*Idema v. Wager*, 120 F. Supp. 2d 361, 365 (S.D.N.Y. 2000).  Under New York law — which the

parties agree applies in this case (*see* Defs.' Mem. 11 n.8; Pl.'s Resp. Opp'n Defs.' Mot. To

Dismiss Compl. and Mot. To Seal 7) — a plaintiff must plead and prove the following five

elements to prevail on a libel claim: "1) a written defamatory statement of fact concerning the

plaintiff; 2) publication to a third party; 3) fault (either negligence or actual malice depending on

the status of the libeled party); 4) falsity of the defamatory statement; and 5) special damages or

*per se* actionability ([*i.e.*, that the statement is] defamatory on its face)."  *Celle v. Filipino*

*Reporter Enters. Inc.*, 209 F.3d 163, 176 (2d Cir. 2000).  "Whether particular words are

defamatory presents a legal question to be resolved by the court in the first instance."  *Aronson v.*

*Wiersma*, 65 N.Y.2d 592, 593 (1985).

As noted above, Plaintiff brings three types of defamation claims: *per se* libel, which is

---

[7]      It is somewhat unclear whether the First Amendment serves as jurisdictional bar or an
affirmative defense to claims that require courts to review ecclesiastical decisions.  Most district
courts to consider the question have treated it as jurisdictional.  *See Klagsbrun v. Va'ad*
*Harabonim of Greater Monsey*, 53 F. Supp. 2d 732, 733-34 (D.N.J. 1999) (converting a Rule
12(b)(6) motion to a Rule 12(b)(1) motion); *accord Hartwig v. Albertus Magnus Coll.*, 93 F.
Supp. 2d 200, 218-19 (D. Conn. 2000) (Droney, J.) (citing *Klagsbrun*); *Yaggie v. Ind.-Ky. Synod*
*Evangelical Lutheran Church in Am.*, 860 F. Supp. 1194, 1198 (W.D. Ky. 1994) ("[T]hese
circumstances dictate our lack of jurisdiction over the matter."); *see also Watson v. Jones*, 80
U.S. (13 Wall.) 679, 733 (1872) (stating that "civil courts exercise no jurisdiction" over a matter
that is "strictly and purely ecclesiastical in its character").  In *Hosanna-Tabor v. Evangelical*
*Lutheran Church &  School v. Equal Employment Opportunity Commission*, 132 S. Ct. 694, 709
n.4 (2012), however, the Supreme Court clarified that the related — but distinct — "ministerial
exception" is not jurisdictional but rather an affirmative defense cognizable under Rule 12(b)(6),
and its broad language could be read to suggest that Defendants' argument here goes to the
merits rather than to the Court's jurisdiction.  In any event, the distinction has no practical import
in this case.  Whether the alleged defect in the Complaint is jurisdictional or not, Plaintiff's
claims fail, and the doctrinal analysis would be the same under either approach.

actionable on its face; *per quod* libel, which is actionable despite its apparent truth in light of extrinsic facts known to the audience; and libel by implication, in which the false statement is contained not in the statement's literal wording but rather its innuendo. *See, e.g.*, *Idema*, 120 F. Supp. 2d at 368 (discussing *per quod* libel); *Matherson v. Marchello*, 473 N.Y.S.2d 998, 1002 n.3 (2d Dep't 1984) (same); *Biro v. Condé Nast*, 883 F. Supp. 2d 441, 464 (S.D.N.Y. 2012) (discussing defamation by implication); *Armstrong v. Simon & Schuster*, 85 N.Y.2d 373, 380-81 (1995) (same).[8] For libel *per quod*, there is an additional requirement that the plaintiff plead "special damages" — that is, actual harm. *Idema*, 120 F. Supp. 2d at 368. And for libel by implication, courts generally require an "especially rigorous showing that (1) the language may be reasonably read to impart the false innuendo, and (2) the author intends or endorses the inference." *Biro*, 883 F. Supp. 2d at 466 (internal quotation marks omitted); *accord Rappaport v. VV Publ'g Corp.*, 618 N.Y.S.2d 746, 748 (N.Y. Sup. Ct. 1994).

Significantly, given that a plaintiff must prove falsity to prevail in any libel action — whether *per se*, *per quod*, or by implication — truth is an absolute defense. *See, e.g.*, *Meloff v. N.Y. Life Ins. Co.*, 240 F.3d 138, 146 (2d Cir. 2001); *Jews for Jesus, Inc. v. Rapp*, 997 So.2d 1098, 1108 (Fla. 2008); *Lewis v. Equitable Life Assurance Soc'y of the U.S.*, 389 N.W.2d 876, 889 (Minn. 1986); *Matovcik v. Times Beacon Record Newspapers*, 849 N.Y.S.2d 75, 78 (2d Dep't 2007). (In the case of libel *per quod* and libel by implication, however, the truth of the statement standing alone is not necessarily a sufficient defense, as libel by implication "is premised not on direct statements but on false suggestions, impressions and implications *arising*

---

[8]     According to the Second Department, it is unclear whether there even is a separate cause of action for libel *per quod* in New York. *See Matherson*, 473 N.Y.S.2d at 1002 n.3; *accord Jewell v. NYP Holdings, Inc.*, 23 F. Supp. 2d 348, 397 (S.D.N.Y. 1998) (describing "the state of 'disarray' surrounding whether New York has adopted the *per se/per quod* distinction" (quoting Robert D. Sack & Sandra S. Baron, *Libel, Slander, and Related Problems* 141-46 (2d ed. 1994))). The Court need not address that issue here.

*from otherwise truthful statements*," *Armstrong*, 85 N.Y.2d at 380-81 (emphasis added), and libel *per quod* "encompass[es] libel in which *the defamatory import can only be ascertained by reference to facts not set forth in the publication*," *Matherson*, 473 N.Y.S.2d at 1002 n.3 (emphasis added).)  "Even substantial truth" — determined from the perspective "of the average reader" — "will preclude a finding of libel." *Meloff*, 240 F.3d at 146 (internal quotation marks omitted); *see also Matovcik*, 849 N.Y.S.2d at 78 (noting that, in determining the truth or falsity of a statement, "minor inaccuracies are acceptable").

## DISCUSSION

### A.  Plaintiff's *Per Se* Libel Claim Is Barred by the First Amendment

As noted, Defendants' principal argument is that judicial determination of whether Plaintiff's claims are valid would "impermissibly entangle" the Court in questions of "ecclesiastical hiring and firing of a church's ministers," "canonical procedure, standards, and decisions," and "church law and doctrine."  (Defs.' Mem. 3).  This argument draws on a long line of Supreme Court cases holding that the First Amendment precludes judicial review of a claim that requires "a searching . . . inquiry into church [doctrine]" and prohibits courts from deciding "religious dispute[s,] the resolution of which . . . is for ecclesiastical and not civil tribunals." *Serbian E. Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 709, 723 (1976); *see also Jones v. Wolf*, 443 U.S. 595, 603 (1979); *Gonzalez v. Roman Catholic Archbishop of Manila*, 280 U.S. 1, 16-17 (1929); *Watson*, 80 U.S. at 726, 733.  These cases stand for the proposition that "civil courts may resolve . . . secular issues that arise with respect to a religious entity, but only when inquiry 'into religious law and polity' is not required." *Ram v. Lal*, 906 F. Supp. 2d 59, 69-70 (E.D.N.Y. 2012) (quoting *Milivojevich*, 426 U.S. at 709).  Stated as a rule of exclusion: "[C]ivil courts may not entertain claims that in effect require religious determinations

that are ecclesiastical, regardless of the nature of the underlying dispute." *Id.* at 70.[9]

Although the Supreme Court has never applied these principles to a claim of defamation, several lower federal courts and state courts have done so. *See, e.g.*, *Hutchison v. Thomas*, 789 F.2d 392, 396 (6th Cir. 1986); *Hartwig*, 93 F. Supp. 2d at 218-19; *Klagsbrun*, 53 F. Supp. 2d at 739-42; *Yaggie*, 860 F. Supp. at 1199; *Farley v. Wis. Evangelical Lutheran Synod*, 821 F. Supp. 1286, 1288-90 (D. Minn. 1993); *Downs v. Roman Catholic Archbishop of Balt.*, 111 Md. App. 616, 625 (Md. Ct. Spec. App. 1996); *Black v. Snyder*, 471 N.W.2d 715, 720 (Minn. Ct. App. 1991); *McManus v. Taylor*, 521 So. 2d 449, 451 (La. Ct. App. 1988).  As these courts have made clear, the First Amendment does not categorically bar defamation claims brought against religious institutions.  *See, e.g.*, *Farley*, 821 F. Supp. at 1290 (noting that "factual scenarios might exist where resolution of a defamation action against a religious organization would not require the court to undertake an inquiry in violation of the First Amendment").  But where a court or jury "would have to determine the truth of the defendants' statements . . . and, in doing so, would examine and weigh competing views of church doctrine," the result is entanglement "in a matter of ecclesiastical concern" that is barred by the First Amendment.  *Hartwig*, 93 F. Supp. 2d at 219; *accord Klagsbrun*, 53 F. Supp. 2d at 739-42.

The decisions in *Klagsbrun* and *Hartwig* are especially instructive here.[10]  In *Klagsbrun*,

---

[9]     There is some ambiguity about whether the prohibition on civil courts considering questions of canonical law or policy derives from the Free Exercise Clause or the Establishment Clause.  *See Hartwig*, 93 F. Supp. 2d at 212 n.15.  For purposes of this Opinion, the distinction is unimportant, as both Clauses are within the First Amendment and the doctrinal analysis employed by prior cases is clear, whatever its constitutional foundation may be.

[10]    These cases are especially instructive because, as in this case, the defamation claims did not directly relate to the hiring or firing of clergy.  *See, e.g.*, *Downs*, 111 Md. App. at 622-23 (discussing many of the cases cited above and noting that "[i]n most instances, as in this one, the alleged defamatory or other tortious conduct has been intertwined with decisions regarding the plaintiff's fitness or suitability to act as a clergyman").  The adjudication of disputes regarding the hiring and firing of clergy raises related but distinct First Amendment concerns, as the

an Orthodox Jewish couple sued a group of Orthodox rabbis, claiming that the rabbis had defamed them by accusing the man of bigamy (specifically, by failing to obtain a religious divorce prior to remarrying) and of refusal to comply with an order of a rabbinical court. *See* 53 F. Supp. 2d at 734-36. On defendants' motion to dismiss, the Court framed "the issue . . . , as far as the First Amendment is concerned," as follows: "whether plaintiffs' defamation claim is ecclesiastical in nature concerning 'discipline, faith, internal organization, or ecclesiastical rule, custom or law,' or a 'purely secular dispute[ ] between third parties and a particular defendant, albeit a religiously affiliated organization.'" *Id.* at 739 (quoting *Milivojevich*, 426 U.S. at 713 and *Gen. Council on Fin. & Admin. of United Methodist Church v. Cal. Superior Court*, 439 U.S. 1369, 1373 (1978), respectively). This inquiry, the Court stressed, did not turn "on conclusory labeling of the whole dispute as either 'secular' or 'ecclesiastical,'" but rather on "the specific elements of the plaintiffs' claim." *Id.* (internal quotation marks omitted).

Scrutinizing the "specific elements" of the plaintiffs' claims, the *Klagsbrun* Court held that the suit was barred by the First Amendment. With respect to the claim that the defendants' statements had falsely labeled Klagsbrun a bigamist, the Court noted that the dispute centered on whether the plaintiff had obtained a religious divorce, not a civil divorce. "Consequently," the Court reasoned, "to ascertain whether the statements were defamatory, this court must ask whether Seymour Klagsbrun was in fact engaged in bigamy *within the meaning of the Orthodox Jewish faith*," a form of "judicial intrusion into ecclesiastical doctrine and practice, which is unquestionably forbidden ground under the First Amendment." *Id.* at 741 (emphasis in original).

---

Supreme Court's recent decision in *Hosanna-Tabor*, 132 S. Ct. at 707-07, makes clear. Although Defendants rely on *Hosanna-Tabor* and argue that adjudication of this case would impermissibly draw the Court into the propriety of Kavanagh's removal from the priesthood (Defs.' Mem. 12), that argument is unpersuasive as Kavanagh challenges only Defendants' characterization of the church courts' opinions removing him from the priesthood, not the propriety of the removal in itself.

With respect to the claim that the defendants had falsely accused Klagsbrun of non-compliance with a rabbinical court order, the Court concluded that even if the defendants' statements "were false, this court would nevertheless be required to evaluate whether failure to comply with an order of a rabbinical court . . . [is a] wrong[] or sin[] within the Orthodox Jewish faith," an "area[] of clear ecclesiastical concern." *Id.* In granting the defendants' motion to dismiss, the Court expressly rejected the plaintiffs' argument that the questions to be answered were "questions of fact and not of competing theological propositions, and thus, [did] not implicate First Amendment concerns." *Id.* at 742. "The important point here," the Court concluded, "is that resolution of the factual disputes would require this court to inquire into religious doctrine and practice. . . . [The First Amendment] is implicated whenever courts must interpret, evaluate, or apply underlying religious doctrine to resolve disputes involving religious organizations." *Id.*

In *Hartwig*, the plaintiff sued not only for defamation, but also for breach of contract, tortious interference with contract, and intentional infliction of emotional distress, after he was removed from his post as an associate professor at a Roman Catholic college for "publicly representing [himself] as a priest of the Roman Catholic Church." 93 F. Supp. 2d at 204. (Plaintiff had been ordained as a Roman Catholic priest; he alleged that he had been placed on a "permanent leave of absence from the active ministry" after informing his superiors that he was gay. *See id.* at 202.) On summary judgment, then-District Judge Droney held that the plaintiff's non-defamation claims did not run afoul of the First Amendment because their resolution would "not require the Court to inquire into competing interpretations of church law or policy. Rather, the central issue for each of them is whether Hartwig was discharged for the reason the College has stated: his alleged misrepresentation of his priestly status." *Id.* at 217-18.[11] By contrast,

---

[11]     Judge Droney made clear that, at trial, the plaintiff would not be permitted to "offer a

13

Judge Droney concluded that the plaintiff's defamation claim would "require a trier of fact to choose between two conflicting ecclesiastical definitions of the term 'priest' and thus would violate the Establishment Clause." *Id.* at 218. "As was the case in *Klagsbrun*," he reasoned, "in order to adjudicate these claims, the Court or the jury would have to determine the truth of the defendants' statements concerning Hartwig's priestly status and, in doing so, would examine and weigh competing views of church doctrine. This would result in the Court entangling itself in a matter of ecclesiastical concern, thereby violating the Establishment Clause." *Id.* at 219.

As these decisions make clear, there is a line — however blurry — dividing claims that a court may adjudicate without running afoul of the First Amendment and claims that would impermissibly entangle a court in matters of ecclesiastical concern. The question in this case is on which side of that line Kavanagh's claims fall. Defendants argue that his claims fall on the excessive entanglement side of the line because, to adjudicate the truth or falsity of the statements at issue, the Court would have "to review and interpret two lengthy canonical court decisions, understand and assess the meaning of sexual abuse of a minor under canon law, determine what constitutes a 'delict' under church doctrine, and finally, resolve whether the canonical courts did in fact convict Kavanagh of multiple counts of sexual abuse of a minor as defined by canon law." (Reply Mem. Further Supp. Defs.' Mot. To Dismiss and Mot. To Seal (Docket No. 17) ("Defs.' Reply Mem.") 1). By contrast, Plaintiff argues that judicial determination of his claims would require the Court "to look no further than the [trial court's] decision itself and see whether [the canonical] court actually did identify 'multiple counts of

---

conflicting interpretation of the teachings of the Roman Catholic Church or canon law to rebut the College's proffered religious reason for not renewing his contract." *Id.* at 216 (citing *DeMarco v. Holy Cross High School*, 4 F.3d 166, 171 (2d Cir. 1993)). To that end, he indicated that "the jury would be instructed that it should presume that the College's asserted religious motive was plausible." *Id.*

14

sexual abuse.'  There is no analysis of church doctrine required.  The Court does NOT have to inquire as to what constitutes sexual abuse of a minor under church law."  (Pl.'s Resp. Opp'n Defs.' Mot. To Dismiss Compl. and Mot. To Seal (Docket No. 13) ("Pl.'s Mem.") 9).  As he puts it: "The Court must simply determine whether the Plaintiff was found guilty of multiple counts of sexual abuse of a minor."  (*Id.* at 14).

If evaluating the truth of Defendants' statement were as straightforward as Plaintiff suggests, the Court would agree that the claims in this case could proceed without running afoul of the First Amendment.  That is, if the Court's or jury's scrutiny of the canonical court decisions were limited to the brute fact that something was or was not said therein, and that scrutiny did not involve an evaluation of canonical law or church doctrine, then adjudication of Plaintiff's claims would "not result in the Court or the jury having to struggle [with] issues of religious doctrine."  *Hartwig*, 93 F. Supp. 2d at 218.  The problem is that, with respect to Plaintiff's libel *per se* claim at least, a review of the canonical court decisions themselves — which the Court may consider whether Defendants' motion is brought under Rule 12(b)(1) or Rule 12(b)(6) because it is referenced in the Complaint, *see, e.g.*, *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) — makes clear that evaluating the truth of Defendants' statement would not be as straightforward as Plaintiff suggests.  That is, in the specific circumstances of this case, evaluating the truth or falsity of Defendants' statement would, as Defendants contend, require that the Court or jury determine what constitutes a "delict" for purposes of church law, determine as a matter of canon law how many delicts Plaintiff was found guilty of, and construe the contours of the substantive sin of "sexual abuse of a minor."  In doing so, the Court or jury would be required to make pronouncements about Catholic doctrine that it is neither competent nor permitted to make.

15

The reason for that complexity lies in the apparent absence of something akin to a civil judgment of conviction stating unambiguously the offense or offenses of which Kavanagh was found guilty and the fact that, on their face, the canonical church decisions are ambiguous with respect to whether Kavanagh was charged with, let alone found guilty of, one offense or multiple offenses. The trial court decision, for example, refers interchangeably — sometimes even within a single sentence — to "the delict" and "the offense" (*i.e.*, in the singular), on the one hand, and "the delicts" and "the offenses" (*i.e.*, in the plural), on the other. (*Compare, e.g.*, Decision at 3, 8, 12, 15, 18, 27, 29, 30, 35 *with id.* at 9, 11, 12, 23, 25, 33, 34). Whereas, at one point, the court states that it is "morally certain that the Accused has committed *the delict* of *an offense* against the sixth commandment of the Decalogue" (*id.* at 15 (emphases added)), only a few pages later, it states that "the *offenses* at issue *were repeated* and . . . there was an increase of frequency and intensity over time." (*Id.* at 23 (emphases added)).[12]  And in a single sentence that encapsulates the ambiguity, it provides that Kavanagh "initiated and carried out *the delict* involving *offenses* against the sixth commandment with a minor below 16 years of age." (*Id.* at 18 (emphases added)). Although one might think that the final section of the opinion, titled "Disposition and Conclusion," would clear up some of this ambiguity, it does anything but, stating in relevant part: "Whether the Reverend Monsignor Charles M. Kavanagh has committed *an offense or offenses* against the sixth commandment of the Decalogue with a *minor or minors* below the age of sixteen, we find in the **AFFIRMATIVE**." (*Id.* at 36 (emphases added)). The appellate

---

[12]     Among the statements suggesting that Kavanagh was convicted of multiple offenses are references to the incident that allegedly took place on the trip to the Right to Life March in Washington, D.C. — that is, the incident about which Donohue changed his testimony — as "the final offense" and the "last of a number of offenses that had begun before Donohue was sixteen years of age." (*Id.* at 22-23). Notably, although the church court referred to that incident as one of the two "most objectively grave lewd acts committed by [Kavanagh] with Donohue," it was not a basis for his conviction, as it occurred when Donohue was older than sixteen, "beyond the age which is constitutive for the delict at issue." (*Id.* at 21).

16

court's decision does nothing to clear up the ambiguity in the trial court's decision.

As a result, the central question for purposes of Plaintiff's libel *per se* claim — whether Defendants' statement that Kavanagh was "found guilty by a Church court of multiple counts of sexual abuse of a minor" (Compl., Ex. 2, at 2) was true or false — cannot be answered by merely looking at the canonical court decisions to see what the courts said as a matter of fact. Instead, it would require the Court or the jury to engage in an inquiry into what constitutes a "delict" or "offense" within the meaning of Catholic law, to determine as a matter of canon law how many delicts or offenses Plaintiff was found guilty of, and to construe the contours of the substantive sin of "sexual abuse of a minor." This, in turn, might involve hearing testimony from one or more of the canonical court judges or even dueling testimony from experts in canonical law. As in *Klagsburn* and *Hartwig*, therefore, "in order to adjudicate [Plaintiff's] claims, the Court or the jury would have to determine the truth of the defendants' statements . . . and, in doing so, would examine and weigh competing views of church doctrine. This would result in the Court entangling itself in a matter of ecclesiastical concern, thereby violating the Establishment Clause [of the First Amendment]." *Hartwig*, 93 F. Supp. 2d at 219.

In arguing otherwise, Plaintiff relies on the Second Circuit's decisions in *Rweyemamu v. Cote*, 520 F.3d 198 (2d Cir. 2008), and *Martinelli v. Bridgeport Roman Catholic Diocesan Corp.*, 196 F.3d 409 (2d Cir. 1999) (Pl.'s Mem. 10-13), but those decisions actually support the Court's conclusion in this case. To the extent relevant here, *Rweyemamu* stands for the uncontroversial — and, for present purposes, irrelevant — proposition that "a plaintiff alleging particular wrongs by the church *that are wholly non-religious in character* is surely not forbidden his day in court." 520 F.3d at 208 (emphasis added). And in *Martinelli*, the Second Circuit distinguished — as this Court has — between consideration of religious teachings and

17

tenets as brute facts, which is permissible under the First Amendment, and evaluation of their validity, which is not.  *See* 196 F.3d at 431.  "The First Amendment," the Court noted, "does not prevent courts from deciding secular civil disputes involving religious institutions when and for the reason that they require reference to religious matters."  *Id.* (citing *Jones*, 443 U.S. at 603). But it does where the party challenging the court's authority can "point[] to" a "disputed religious issue which the jury or the district judge in [the] case [would be] asked to resolve."  *Id.*

In this case, Defendants have pointed to a disputed religious issue that the Court or the jury would be asked to resolve in connection with the libel *per se* claim — namely, the truth or falsity of the Catholic Church's characterization of its own law and doctrine.  The First Amendment bars this Court from addressing that issue.  At bottom, Plaintiff's libel *per se* claim, like the defamation claims at issue in *Klagsbrun* and *Hartwig*, calls on this Court to put its civil imprimatur on what are deeply ecclesiastical points of Catholic faith and practice.  The First Amendment serves to prevent exactly this sort of picking of winners in ecclesiastical matters. Accordingly, Plaintiff's libel *per se* claim must be, and is, dismissed.

**B.  Plaintiff Fails To State a Claim of Libel by Implication or Libel *Per Quod***

Although Plaintiff's libel *per se* claim is barred by the First Amendment, the same cannot be said for his claims of libel by implication and libel *per quod*.  The gravamen of Plaintiff's libel by implication claim is that, by stating that he was "found guilty of multiple counts of sexual abuse of a minor," Defendants falsely implied that he "was found guilty of criminal conduct" — that is, that he was convicted in a civil court rather than a church court.  (Pl.'s Mem. 22).  Determining the truth or falsity of that alleged implication would not drag the Court or the jury into a dispute over Catholic doctrine or law for the simple reason that there is dispute at all: Plaintiff was convicted in church court proceedings, not civil court proceedings.  Similarly, the

gravamen of Plaintiff's libel *per quod* claim is that, considered in light of media reports suggesting that "hundreds of [Catholic] priests" had "raped and molested children for years," Defendants' statement falsely suggested that Kavanagh "must have raped or molested many young victims." (Pl.'s Mem. 23-24). Again, determining the truth or falsity of that alleged suggestion would not run afoul of the First Amendment because there is no dispute about the underlying fact: Kavanagh was found guilty of abusing only one victim, Donohue.

But these claims fail for a more straightforward reason: they do not state plausible claims. As noted above, to prevail on a claim of libel by implication, a plaintiff must generally make an "especially rigorous showing that (1) the language may be reasonably read to impart the false innuendo, and (2) the author intends or endorses the inference." *Biro*, 883 F. Supp. 2d at 466 (internal quotation marks omitted). In this case, Kavanagh's allegations fall far short of making such a showing, as Defendants' statement, on its face, belies Plaintiff's claim of innuendo. That is, the Archdiocese's press release stated expressly that "Mr. Kavanagh was found guilty *by a Church court* of multiple counts of sexual abuse of a minor." (Compl. Ex 2, at 2 (emphasis added)). Given that the statement explicitly refutes the implication Plaintiff claims it has — namely, that he was convicted by a lay court of a crime — the Court concludes as a matter of law that it is not defamatory by implication and therefore that Plaintiff has failed to plead a necessary element of his claim. Accordingly, Plaintiff's defamation by implication claim is dismissed.[13]

Plaintiff's libel *per quod* claim fails for two reasons. First, as with the libel by implication claim, Plaintiff's allegations are belied by the language of Defendants' statement.

---

[13]     Attached to Plaintiff's Complaint is an affidavit signed by Ari L. Goldman, a journalism professor at Columbia University, purporting to provide evidence that the statements complained of are "ambiguous and even deceptive." (Compl. Ex. 8, at 1). Because the Court concludes that the allegedly defamatory statements are not actionable as a matter of law, it is unnecessary to consider that affidavit.

Put simply, the notion that the public would conclude that Plaintiff molested "many" young victims is implausible in view of the statement's unmistakable use of singular, as opposed to plural, definite articles and pronouns: "It has come to the attention of the Archdiocese that *the* victim in *the* Charles Kavanagh case has changed one of *his* claims, specifically concerning an overnight trip to Washington, D.C., during *the* victim's senior year of high school." (Compl. Ex 2, at 2 (emphasis added)).   Second, Plaintiff fails to plead special damages. (*See* Compl. ¶¶ 53, 66).   As noted above, New York law is unambiguous that such pleading is an unbending requirement of defamation *per quod* claims, to the extent such claims exist independently under New York law. *See, e.g.*, *Idema*, 120 F. Supp. 2d at 368.   New York law requires the identification of "the loss of something having economic or pecuniary value which must flow directly from the injury to reputation by defamation; not from the effects of defamation." *Id.* (quoting *Matherson*, 473 N.Y.S.2d at 1001).   In this case, Plaintiff merely complains that he has "incurred both general and special damages" (Compl. ¶ 53), which does not suffice.   For each of these reasons, Plaintiff's defamation *per quod* claim is dismissed.

**C.    The Canonical Court Decisions Shall Be Maintained Under Seal**

During oral argument on the present motion, Judge Cedarbaum ordered Defendants to submit copies of the canonical court decisions to be filed under seal; they did so, and the Court has since placed the documents under seal. (Docket No. 33).   Defendants ask that the decisions remain under seal (Defs.' Mem. 21-23; Defs.' Reply Mem. 16-17; Docket No. 33); Plaintiff opposes their request (Pl.'s Mem. 24-25; Docket No. 34).

The Second Circuit has held that "documents submitted to a court for its consideration in a . . . motion are — as a matter of law — judicial documents to which a strong presumption of [immediate public] access attaches, under both the common law and the First Amendment."

*Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 126 (2d Cir. 2006). In this case, moreover, the weight to be given that presumption of access is strong, as the documents at issue "directly affect[ed]" the Court's adjudication of Defendants' motion to dismiss. *Id.* at 119 (quoting *United States v. Amodeo*, 71 F.3d 1044, 1049 (2d Cir. 1995). Nevertheless, the presumption of access "can be overcome . . . by specific, on-the-record findings that higher values necessitate a narrowly tailored sealing." *Id.* The Court's task is to "balance competing considerations" — including but not limited to "'the danger of impairing law enforcement or judicial efficiency' and 'the privacy interests of those resisting disclosure'" — against the presumption in favor of public access. *Id.* at 120 (quoting *Amodeo*, 71 F.3d at 1050). "The burden of demonstrating that a document submitted to a court should be sealed rests on the party seeking such action." *DiRussa v. Dean Witter Reynolds Inc.*, 121 F.3d 818, 826 (2d Cir. 1997).

Here, Defendants have carried their burden to justify keeping the church court decisions under seal. Doing so serves at least two higher values. First, sealing serves the interest of third parties — most notably, Donohue — in privacy, as the decisions contain sensitive and personal information about the sexual abuse of a minor. *See, e.g.*, *Hilbert S. v. Cnty. of Tioga*, No. 3:03 Civ. 193, 2005 WL 1460316, at *15 (N.D.N.Y. June 21, 2005) (sealing a file based on the interest in protecting the privacy of children who were sexually and physically abused). Second, as Plaintiff himself acknowledges (Compl. ¶ 24), church court proceedings are confidential and the parties involved in them are bound by "pontifical secrecy, . . . an ecclesiastical legal standard of confidentiality." (Decl. of Fr. Richard L. Welch (Docket No. 10) ¶ 12). This Court is required to give great deference to that status under ecclesiastical law. *See, e.g.*, *Milivojevich*, 426 U.S. at 721-25; *Watson*, 80 U.S. at 727. In fact, the mere attempt to balance the importance of "pontifical secrecy" under Catholic law against the importance of public access to judicial

documents under civil law would threaten the very First Amendment values discussed at length above.  Taken together, these two considerations — privacy and deference to pontifical secrecy — justify keeping the canonical court decisions under seal.  In the event of an appeal, however, counsel on appeal may have access to the decisions without further application to the Court.

## CONCLUSION

For the foregoing reasons, Defendants' motion is GRANTED, and Plaintiff's Complaint is dismissed in its entirety.  Further, the Court orders that the canonical court decisions shall remain under seal, although in the event of an appeal counsel on appeal may have access to them without further application to the Court.

The Clerk of Court is directed to terminate Docket Number 9 and to close the case.

SO ORDERED.

Dated: February 14, 2014
      New York, New York

_____
JESSE M. FURMAN
United States District Judge